## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **PANAYIOTA P. K.,**[1] | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | ) **Case No. 20-cv-197-MAB** |
| | ) |
| **COMMISSIONER of SOCIAL** | ) |
| **SECURITY,** | ) |
| | ) |
| **Defendant.** | ) |

### MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff, represented by counsel, seeks judicial review of the final agency decision denying her application for Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423.[2]

### PROCEDURAL HISTORY

Plaintiff applied for SSI in July 2016, alleging disability as of January 1, 2015. After holding an evidentiary hearing, an ALJ denied the application on February 25, 2019. (Tr. 15-28). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

---

[1] In keeping with the court's practice, Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. *See* Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.
[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c). *See* Docs. 8 & 11.

## ISSUES RAISED BY PLAINTIFF

Plaintiff raises the following points:

1. The ALJ erred by failing to account for deficits of concentration, persistence, or pace in the RFC.

## APPLICABLE LEGAL STANDARDS

To qualify for SSI, a claimant must be disabled within the meaning of the applicable statutes and regulations.[3] Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a plaintiff is disabled, the ALJ considers the following five questions in order: (1) Is the plaintiff presently unemployed? (2) Does the plaintiff have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the plaintiff unable to perform her former occupation? and (5) Is the plaintiff unable to perform any other work? 20 C.F.R. § 404.1520.

An affirmative answer at either step three or step five leads to a finding that the plaintiff is disabled. A negative answer at any step, other than at step three, precludes a

---

[3] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423, *et seq.*, and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, *et seq.*, and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes and regulations are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

finding of disability. The plaintiff bears the burden of proof at steps one through four. Once the plaintiff shows an inability to perform past work, the burden then shifts to the Commissioner to show the plaintiff's ability to engage in other work existing in significant numbers in the national economy. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether Plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme Court defines substantial evidence as, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

### THE DECISION OF THE ALJ

The ALJ followed the five-step analytical framework described above. She

determined that Plaintiff had not engaged in substantial gainful activity since July 12, 2016, the application date.

The ALJ found that Plaintiff had severe impairments of bipolar disorder with psychotic features, depressive disorder, generalized anxiety disorder, posttraumatic stress disorder (PTSD), and migraines.

The ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

The ALJ found that Plaintiff had the residual functional capacity (RFC) to perform a full range of work at all exertional levels but with the following non-exertional limitations:

> The claimant can never climb ladders, ropes, or scaffolds; she is limited to working in an environment with no more than a moderate noise level (as defined in the Selected Characteristics of Occupations); she can tolerate no more than occasional exposure to dusts, fumes, odors, gases, poor ventilation, and other pulmonary irritants; she can tolerate no more than occasional exposure to hazards, such as unprotected heights; she can perform work involving simple, routine, repetitive tasks, but should perform no work with an assembly line or conveyor belt; and she can tolerate occasional interaction with coworkers and supervisors, but should have no contact with the general public.

Tr. (22).

Based on the testimony of a vocational expert (VE), the ALJ concluded that Plaintiff is unable to perform past relevant work yet concluded there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

### THE EVIDENTIARY RECORD

The Court reviewed and considered the entire evidentiary record in preparing this Memorandum and Order. The following summary of the record is directed to Plaintiff's arguments.

### 1.    Agency Forms

Plaintiff was born in 1969 and was 49 years old on the date of the ALJ's decision. (Tr. 184). Plaintiff said she stopped working in July 2009 because of her conditions. She previously worked as a waitress from January 2000 to July 2009. (Tr. 188-90).

In a Function Report submitted in February 2017, Plaintiff said she has depression, confusion, and PTSD; gets disoriented; cannot focus or sleep; and is irritable. Plaintiff said she is restless at night and does not care about personal care. Plaintiff said she needs reminders for taking care of herself and taking her medications. Plaintiff said she makes cereal, salads, and sandwiches; does some light cleaning; and does her laundry. (Tr. 237-39). Plaintiff said she gets easily confused and does not spend time with others. Plaintiff said she likes to read and watch television, but she reads less than she used to. Plaintiff said she is irritable, angry, and antisocial. She said her conditions affect her task completion, concentration, understanding, ability to understand, and her ability to get along with others. Plaintiff said she does not follow written or spoken instructions well and does not get along with authority figures well. She said she does not handle stress or changes in routine well. (Tr. 241-43).

### 2.    Evidentiary Hearing

Plaintiff was represented by an attorney at the evidentiary hearing in October 2018. (Tr. 34-56). Plaintiff said anger is her most significant problem that stops her from

working. When she goes grocery shopping, Plaintiff said people will try to take her picture, stare at her, and talk about her, and this causes verbal confrontations. Plaintiff said when these things happen, the voice in her head named "Tommy," something she hears every time she gets angry, will tell her to smack them. Plaintiff said she has anxiety attacks because she has not had her medicine for two months, and she has them all day every day. When on her medicine, Plaintiff has three to four anxiety attacks a week on average. Plaintiff said her medication was increased because it made her bipolar disorder worse. Plaintiff said she cannot be around people because they anger and aggravate her. Plaintiff believes counseling helped her PTSD symptoms, but she still gets terrifying nightmares. Plaintiff said she does her laundry, watches television, and only cooks for herself when she needs to eat. She said she has no motivation and was fired from a bartender job due to verbal and physical fighting with coworkers and customers. (Tr. 40-50).

A vocational expert (VE) testified at the evidentiary hearing. The ALJ presented hypotheticals to the VE which corresponded to the ultimate RFC findings, and the VE testified that a person with Plaintiff's RFC could not do her past work but could do light jobs such as a cleaner, a hand packer, or a production worker. The VE testified that a person who is off task ten percent or more will result in termination. The VE said an individual would possibly not be terminated after one verbal confrontation, but an additional verbal confrontation would result in termination. The VE also said any physical confrontation would be met with immediate dismissal. (Tr. 52-54).

### 3.    Relevant Medical Records

Plaintiff presented to Edward Anderson, a physician assistant for Southern Illinois Healthcare Foundation, on August 10, 2015. The assessment included depressive disorder, and anxiety, and plans included medications. (Tr. 293).

Plaintiff presented to Sang Yun Nelson, a licensed clinical social worker, over sixty times between September 2015 and August 2018, reporting feeling depressed; having "breakdowns"; having increased irritability; racing thoughts; mania; hair loss; increased sadness; anxiety; fatigue; excessive crying; an increased need for sleep; feelings of rage; trembling; hot flashes; concentration/memory problems; palpitations; restlessness; intrusive unpleasant thoughts; detachments; hypervigilance of surroundings; flashbacks; recurring nightmares; anger; increased tendency/reaction to being startled; psychotic features regarding "Tommy"; being baited by "Tommy" when she is upset and angry; stopping going to the gym to avoid being around people; and hypervigilance to threat.[4]

LCSW Nelson noted Plaintiff was cooperative and calm; had clear speech; had visual hallucinations of little things in front of her; had auditory hallucinations ("Tommy"); was oriented to situation, time, place and person; was alert; had intact memory; had a sad and irritable mood at times; had a stable mood at times; had a euthymic mood at times; had a congruent affect at times; had a pleasant and happy affect at times; had an anxious, angry, sad, tired and tearful affect; had average intelligence; and

---

[4] Tr. 425-26, 436-38, 449-50, 472-74, 484-85, 496-97, 520-21, 532-33, 555-57, 567-69, 590-91, 615-16, 627-28, 639-40, 662-64, 674-76, 711-13, 733-34, 757-58, 781-82, 792-94, 815-16, 825-27, 846-47, 856-57, 1042, 1047-49, 1055, 1063, 1069-71, 1077, 1086, 1091-93, 1099-1101, 1106-08, 1115, 1123, 1129-30, 1136-37, 1143-45, 1151-52, 1158-59, 1167, 1173-74, 1180-82, 1187-89, 1194-96, 1201-02, 1209, 1215-16, 1222, 1228-29, 1234-35, 1242, 1248-49, 1254-56, 1261, 1269, 1274-75, 1280-82, 1287-88, 1295, 1300-01, 1307-08, 1313-14, 1320, 1327, 1333-34, 1339-41, 1346-47.

had intact judgment, insight and thought processes.[5] The assessment included severe depressed bipolar I disorder with psychotic features, mixed bipolar affective disorder (severe with psychosis), chronic PTSD, and generalized anxiety disorder with recurrent major depressive episodes, and plans included reducing symptoms of anxiety, panic attacks, and irritability; continuing discussion of past traumas, relationships, anger and detachment; decreasing avoidance strategies; monitoring any changes in mood or behaviors; daily exercise; reviewing positive words daily; engaging in relaxing activities; and managing and monitoring anger.[6]

Plaintiff presented to Carole Hunt, a registered nurse, over twenty times between October 2015 and July 2018, reporting seeing shadows; thinking someone is calling her name; fatigue; bad anxiety; sleep disturbances; depression; feeling irritable; hallucinations; mood swings; racing thoughts; nightmares; avoiding people; stress; concentration problems; panic attacks; hyperarousal; and not going out in public because of the voice in her head, "Tommy."[7] RN Hunt said, "Plaintiff spoke about 'Tommy' who seems to be defined by her as another personality." (Tr. 579).

RN Hunt noted Plaintiff was cooperative and calm; had clear speech; was

---

[5] Tr. 430, 442, 454, 478, 490, 502, 525-26, 537, 561, 573, 596, 620-21, 633, 644-45, 668, 681, 716, 739, 763, 786, 798, 820, 830, 851, 860, 1048, 1055, 1070, 1077, 1092, 1100, 1107, 1114-15, 1129, 1137, 1144, 1151, 1159, 1173-74, 1181, 1188, 1195, 1202, 1215, 1221-22, 1228, 1235, 1248, 1255, 1261-62, 1274, 1281, 1288, 1301, 1307, 1314, 1320, 1333, 1340, 1346.

[6] Tr. 425, 437, 449, 473, 484-85, 496, 520, 532, 556, 567-68, 590, 615, 627, 639, 663, 675, 711, 733, 757, 781, 793, 815, 826, 846, 856, 1048, 1055-56, 1070, 1077-78, 1092-93, 1100, 1107, 1115, 1129, 1137, 1144, 1152, 1159, 1174, 1181, 1188, 1195-96, 1202, 1216, 1222, 1228-29, 1235, 1248-49, 1255, 1262, 1275, 1281, 1288, 1301, 1307-08, 1314, 1321, 1334, 1340, 1347.

[7] Tr. 413-14, 460-62, 466, 508, 513, 544, 549, 579, 584, 603-04, 608, 651, 656, 687-88, 693, 699, 704, 722, 727, 745, 751, 769-70, 804, 809, 835-36, 840, 1056, 1062, 1078, 1115, 1121, 1159, 1166, 1203, 1208, 1236, 1241, 1262, 1268, 1288, 1294, 1321, 1327.

hypertalkative at times; had poverty of speech; was oriented to situation, time, place and person; had intact memory; had visual and auditory hallucinations; had below average to average intelligence; had an irritable, sad, and euthymic mood; had an anxious, angry, sullen, sad, constricted and tearful affect; had a pleasant, happy, and congruent affect at times; was alert; had impaired insight and judgment; had intact insight at times; had intact judgment at times; had intact thought processes at times; had circumstantial and tangential thought processes at times; had a flight of ideas; and reported another personality (Tommy). (Tr. 418, 466, 514, 549, 584, 608-09, 656, 693, 705, 727, 751, 775, 840, 1062, 1084, 1122, 1166, 1241, 1268, 1294, 1327). The assessment included bipolar affective disorder, generalized anxiety disorder, and chronic PTSD, and plans included medication management, exercise, nutrition, practicing progressive relaxation when feeling anxious or stressed, continuing counseling, and getting a good night's sleep. (Tr. 413, 461, 508-09, 544, 579, 603, 651, 688, 699, 723, 745, 770, 804, 836, 1062-63, 1085, 1122, 1166-67, 1209, 1242, 1268, 1294, 1327).

Plaintiff presented to the emergency department at Anderson Hospital three times between October and November 2015. (Tr. 311, 325, 333). Physical examinations revealed Plaintiff was in no distress; was alert; was oriented; had normal speech; and had a normal mood and affect. (Tr. 311, 325-26, 334).

Plaintiff presented to PA Anderson on October 13, 2015. The assessment included generalized anxiety disorder, chronic PTSD, and anxiety. (Tr. 283).

Plaintiff presented to Muhiyuddin Khalid, an internist, thirteen times between November 2015 and November 2017, reporting chronic anxiety; depression; bipolar

disorder; having stabilized her psychiatric illnesses; restlessness; difficulty sleeping; and neurological issues. (Tr. 378, 380, 382, 384, 386, 388, 390, 1595, 1597, 1599-1600, 1602, 1604, 1606). Plaintiff said she used to go to a clinic in Granite City, but she did not like them, and she was not taking her bipolar disorder medication because she did not like it. (Tr. 390). Dr. Khalid noted Plaintiff was in no distress but was moderately distressed at one appointment; was very anxious; was stressed; had controlled depression to a degree; was alert; was coherent; was oriented; and had a normal mood and affect. (Tr. 381, 391, 1598, 1600, 1606).

Plaintiff presented to Thomas Sanford, an otolaryngologist, and his staff nine times between August 2016 and August 2018, reporting night sweats; sleep problems; nervousness; anxiety; panic; depression; confusion; problems concentrating; nightmares; fatigue; hypnopompic hallucination weekly or more; and ruminating thoughts. (Tr. 905, 910, 915, 920, 925, 934-36, 1499, 1505-06, 1521, 1548, 1563, 1581). Dr. Sanford noted Plaintiff was in no acute distress; was alert; and was oriented to person, place and time. (Tr. 912, 922, 941, 1503, 1510, 1525, 1551, 1567). The assessments included "insomnia, chronic, due to psychophysiologic, depression, anxiety and osa" and nightmares. (Tr. 942).

Plaintiff presented to the Center for Gastrointestinal Health seven times between August 2016 and November 2017, reporting anxiousness, depression, and difficulty sleeping. (Tr. 399-400, 885, 1023, 1026, 1029, 1031, 1479). Physical examinations revealed Plaintiff was alert, oriented, and in no distress. (Tr. 400, 886, 1024, 1027, 1030, 1032, 1480).

Plaintiff presented to Stephen Vincent, a state agency psychological consultant, on December 15, 2016, and underwent a Psychological Evaluation. (Tr. 876). Dr. Vincent said

Plaintiff has, "mood disturbances, as well as OCD, PTSD, difficulties in regards to maintaining any form of continuity in regards to perception of self, as well as the world around her." Dr. Vincent noted Plaintiff has anxiety, poor memory, episodes of psychotic deterioration in regards to the "Tommy" voice which is "harassing and negativistic resulting in episodes of intermittent explosiveness and aggression towards others which has caused conflicts from school and no resulting in a tendency to withdraw and isolate." Dr. Vincent noted Plaintiff's mood swings can be rapid and drastic, and her depression is most prominent and problematic. Dr. Vincent's diagnostic impressions included, "Bipolar Disorder, mixed, currently depressed, moderate to moderately severe. Posttraumatic Stress Disorder as per history. Intermittent Explosive Disorder as per history. Generalized Anxiety Disorder. Borderline Personality Disorder." (Tr. 880).

Plaintiff presented to Joseph Espiritu, a sleep medicine doctor, five times between June 2017 and August 2018, reporting worrying about everything while lying awake in bed; poorly controlled bipolar disorder; an inability to sit still; and uncontrolled anger. (Tr. 973, 981, 1003, 1413, 1511, 1568). The assessment included chronic insomnia due to bipolar disorder, and plans included healthy eating and exercise. (Tr. 976-77, 983, 1010, 1418, 1519, 1578).

Plaintiff presented to Mohammad Tahir, a cardiologist, on June 8, 2017, reporting chest pain that possibly is due to anxiety and panic attacks, and sleep issues with anxiety. (Tr. 1698).

Plaintiff presented to Ahmed Jafri, a neurologist, on October 16, 2017. (Tr. 987). The assessment included chronic insomnia due to bipolar disorder. (Tr. 994).

Plaintiff presented to Dr. Jafri on November 14, 2017. (Tr. 1483). Dr. Jafri noted Plaintiff was alert; was oriented to all parameters of time and location; and had intact speech, language, and cognitive functions. (Tr. 1485).

Plaintiff presented to Lynn Billhartz, a physician assistant at Maryville Women's Center, on March 12, 2018. (Tr. 1377). PA Billhartz noted Plaintiff had an appropriate mood and affect and was oriented to time, place, person and situation. (Tr. 1380).

Plaintiff presented to a speech-language-hearing clinic on April 23, 2018, and underwent a mental status examination. Plaintiff received a score that indicated a mild neurocognitive disorder. Plaintiff required increased processing time with questions and said, "I can't concentrate." (Tr. 1405-06). Further speech therapy was recommended to address Plaintiff's deficits, and plans included a neurology referral and examination. (Tr. 1410).

Plaintiff presented to Aninda Acharya, a neurologist, on April 27, 2018, reporting long-time problems with thinking and memory; a depressed mood; and confusion that leads to frustration. (Tr. 1536, 1539). Dr. Acharya noted Plaintiff was alert, oriented, and had good comprehension. The impression included subjective memory impairment, and recommendations included neuropsychological testing to evaluate Plaintiff's cognitive impairment. (Tr. 1540).

Plaintiff presented to PA Billhartz on April 30, 2018, reporting moodiness and anxiety. (Tr. 1371, 1373). PA Billhartz noted Plaintiff was oriented to time, place, person and situation and had an appropriate mood and affect. The assessment included "symptoms such as…lack of concentration, associated with natural (age-related)

menopause." (Tr. 1374).

Plaintiff presented to Maureen Lyons, an internist, on May 7, 2018, reporting fatigue and mood disturbance. (Tr. 1542, 1545-46). Dr. Lyons noted Plaintiff was alert and in no distress. The assessment included bipolar disorder and cognitive impairment concerns, and plans included continuing with psychiatry, neuropsychological testing, and medications. (Tr. 1546-47).

Plaintiff underwent a brain MRI on July 6, 2018, due to a history of an altered mental status, and the impression was, "1. Partially empty sella. Otherwise, normal examination of the brain." (Tr. 1577).

Plaintiff presented to Dr. Tahir on August 23, 2018, reporting chest pain that could be due to her anxiety and panic attacks, and disrupted sleep combined with anxiety. Dr. Tahir noted Plaintiff was in no distress; was alert and oriented to time, place and person; and had a normal mood and affect. (Tr. 1363-65).

Plaintiff presented to Phillip Ruppert, a neuropsychologist, for a neuropsychological evaluation on September 14, 2018, reporting depression; bipolar disorder; anxiety; PTSD; reduced energy; anhedonia; an irritable mood; sadness; crying; manic episodes; panic attacks; difficulty breathing; nightmares; intrusive thoughts; always being angry; and memory problems. Dr. Ruppert noted Plaintiff was alert; was cooperative; had an anxious and depressed affect; was receptive; had normal expressive language; had grossly organized thought processes; and had focused and sustained attention. Dr. Ruppert said Plaintiff, "obtained atypically low scores on measures of performance validity, indicating likely suboptimal task-engagement during parts of this

evaluation. Thus, current test results may underestimate Ms. Kyriakidis's actual level of cognitive ability," and there was a possible over-endorsement of symptoms. Dr. Ruppert said there were deficits on measures of visual judgment, semantic fluency, and adaptive problem solving; there was relatively preserved performance on auditory attention; and there was variable performance on measures of verbal learning, processing speed, and delayed recall. Dr. Ruppert's diagnoses included major depressive disorder, bipolar disorder, generalized anxiety disorder, and PTSD. Recommendations included a follow-up with Plaintiff's psychiatrist and psychotherapist for treatment of her mood and anxiety symptoms. (Tr. 1775-77).

### 4. Medical Opinions

Howard Tin, a state agency psychological consultant, performed a mental residual functional capacity assessment on December 21, 2016. Dr. Tin said Plaintiff has concentration and persistence limitations; is moderately limited in the ability to maintain attention and concentration for extended periods; is moderately limited in the ability to work in coordination with or in proximity to others without being distracted by them; and is moderately limited in the ability to interact appropriately with the general public. Dr Tin said, "Claimant has difficulty in interacting appropriately with the general public and harbors anger towards others, so limit work tasks that do not require interaction with the general public." (Tr. 66-68).

M. W. DiFonso, a state agency psychological consultant, performed a mental residual functional capacity assessment on April 15, 2017. Dr. DiFonso's findings were duplicative of Dr. Tin's findings. (Tr. 82-84).

<u>ANALYSIS</u>

Plaintiff asserts the ALJ erred by failing to account for deficits of concentration, persistence, or pace in the RFC.

The ALJ's RFC assessment and the hypothetical question posed to the VE must both incorporate all the limitations that are supported by the record. *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014). This is a well-established rule. See *Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009) (collecting cases). If the ALJ finds that a plaintiff has a moderate limitation in maintaining concentration, persistence or pace, that limitation must be accounted for in the hypothetical question posed to the VE. The Seventh Circuit has repeatedly held, with exceptions not applicable here, that a limitation to simple, repetitive tasks or unskilled work does not adequately account for a moderate limitation in maintaining concentration, persistence or pace. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010); *Yurt v. Colvin*, 758 F.3d at 857; *Varga v. Colvin*, 794 F.3d 809, 814 (7th Cir. 2015); *Taylor v. Colvin*, 829 F.3d 799, 802 (7th Cir. 2016); *Moreno v. Berryhill*, 882 F.3d 722, 730 (7th Cir. 2018), as amended on reh'g (Apr. 13, 2018); *Winsted v. Berryhill*, 915 F.3d 466, 471 (7th Cir. 2019), *DeCamp v. Berryhill*, 916 F.3d 671, 676 (7th Cir. 2019). "The ability to stick with a given task over a sustained period is not the same as the ability to learn how to do tasks of a given complexity." *O'Connor-Spinner*, 627 F.3d at 620.

Here, the ALJ found that Plaintiff had moderate difficulties in maintaining concentration, persistence or pace at step three of the sequential analysis when determining whether Plaintiff's mental impairments meet or equal a listed impairment. The ALJ noted that, while the step three determination is not a mental RFC assessment,

the ultimate RFC assessment "reflects the degree of limitation [the ALJ has] found in the 'paragraph B' mental functional analysis." (Tr. 22).

In regard to Plaintiff's mental limitations, the ALJ's RFC finding says she, "can perform work involving simple, routine, repetitive tasks, but should perform no work with an assembly line or conveyor belt; and she can tolerate occasional interaction with coworkers and supervisors, but should have no contact with the general public." (Tr. 22). Plaintiff suggests this language does not adequately account for moderate limitations in concentration, persistence or pace. This Court agrees. A limitation to simple, routine and rote tasks does not account for difficulties in concentration arising from mental health issues. *Varga*, 794 F.3d at 815. Moreover, the ALJ used the terminology that the Seventh Circuit has continually viewed as insufficient. Therefore, this requires remand.

There are two recent Seventh Circuit cases that speak directly to this issue: *Martin v. Saul*, 950 F.3d 369 (7th Cir. 2020) and *Crump v. Saul*, 932 F.3d 567 (7th Cir. 2019). In *Martin*, the court held the ALJ correctly accounted for Martin's concentration, persistence or pace limitations by not "assuming that restricting [Martin] to unskilled work would account for her mental impairments." *Id*. at 374. "The ALJ incorporated pace-related limitations by stating that Martin needed flexibility and work requirements that were goal-oriented." *Id*. The ALJ in *Crump* used language in the RFC that the Seventh Circuit has repeatedly found insufficient such as, "simple, routine, repetitive tasks with few workplace changes." *Crump*, 932 F.3d at 569. The court held the ALJ failed to incorporate limitations like Crump's likelihood of being off task twenty percent of the time. *Id*. at 570.

Here, the ALJ did not go to lengths as the ALJ in Martin did. The present case is

similar to *Crump* in that the ALJ limited Plaintiff to work involving "simple, routine, repetitive tasks." This, as established above, is not enough. The ALJ does note that Plaintiff should perform no work with an assembly line or conveyor belt. However, that does not fix the deficiencies within the RFC. "Observing that a person can perform simple and repetitive tasks says nothing about whether the individual can do so on a sustained basis, including, for example, over the course of a standard eight-hour work shift." *Crump*, 932 F.3d at 570. The Seventh Circuit put it succinctly in *Martin*:

> As we have labored mightily to explain, however, the relative difficulty of a specific job assignment does not necessarily correlate with a claimant's ability to stay on task or perform at the speed required by a particular workplace. . . . Put another way, someone with problems concentrating may not be able to complete a task consistently over the course of a workday, no matter how simple it may be.

950 F.3d at 373-74. Therefore, without more, the RFC does not adequately account for moderate limitations in concentration, persistence or pace.

The Commissioner relies in part on *Jozefyk v. Berryhill*, 923 F.3d 492 (7th Cir. 2019). There, the Seventh Circuit rejected the plaintiff's argument that the ALJ erred by omitting a reference to a moderate limitation in concentration, persistence or pace from the RFC assessment and hypothetical question where "according to the medical evidence, his impairments surface only when he is with other people or in a crowd." *Jozefyk*, 923 F.3d at 498. That case is distinguishable from the case at hand. The Seventh Circuit explained its holding in *Jozefyk* in a later case:

> In closing, we owe a word to the Commissioner's reliance on our recent decision in *Jozefyk v. Berryhill*, 923 F.3d 492 (7th Cir. 2019). We do not read *Jozefyk* to save the shortfalls in the ALJ's analysis here. In *Jozefyk*, we determined that any error in formulating the RFC was harmless because the

> claimant had not testified about any restrictions in his capabilities related to concentration, persistence, or pace, and the medical evidence did not otherwise support any such limitations. 923 F.3d at 498. As the Commissioner concedes, the facts here are different. The medical evidence plainly shows, and the ALJ recognized, that Crump suffers from CPP limitations. And, unlike in *Jozefyk*, Crump testified consistently with the medical treatment notes about how her bipolar disorder impairs her ability to concentrate well enough to work for a sustained period.

*Crump*, 932 F.3d at 571. Here, as in *Crump*, the ALJ noted Plaintiff has a moderate impairment with concentration, persistence and pace. (Tr. 21). Additionally, Plaintiff testified that, even when on medication, she has anxiety attacks three to four times a week, and Plaintiff said her anger is one of the most significant problems that stops her from working. (Tr. 40, 44).

Lastly, the Commissioner points out that the "B" criteria have been amended and attempts to minimize the significance of the findings of moderate limitations by pointing out that "moderate" limitation means that a claimant's ability to maintain concentration, persistence or pace independently, appropriately, effectively, and on a sustained basis is fair. *See* Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66138, 66164, 2016 WL 5341732 (Sept. 26, 2016) (effective Jan. 17, 2017). But a moderate limitation is not the same as "no" limitation. A "mild" limitation means that functioning is "slightly" limited and a "marked" limitation means that functioning is "seriously limited." Moderate is between mild and marked.  81 Fed. Reg. 66138, 66164. Therefore, a moderate limitation is more than a slight limitation, and the ALJ may not overlook the designation of moderate limitations in the RFC. Further, these definitions do not represent a change in the meaning of these terms:

> Third, we have used the words "mild," "moderate," "marked," and "extreme" under our prior rules for many years. Although we did not provide definitions for most of these terms until now, the definitions in final 12.00F are consistent with how our adjudicators have understood and used those words in our program since we first introduced the rating scale in 1985. As a result, the definitions we provide in these rules do not represent a departure from prior policy.

81 FR 66138, 66147.

For these reasons, the ALJ did not adequately account for concentration, persistence or pace within the RFC finding. Therefore, this requires remand.

As a sub-issue to Plaintiff's concentration, persistence or pace argument, Plaintiff asserts the ALJ erred by citing to activities of daily living without explaining why that activity shows an ability to perform full-time work. "An ALJ may not equate activities of daily living with those of a full-time job…But an ALJ is not forbidden from considering statements about a claimant's daily life." *Jeske v. Saul*, 955 F.3d 583, 592 (7th Cir. 2020). An ALJ may consider the claimant's activities of daily living to determine whether the claimant's symptoms are as high in severity as alleged. *Id*. at 593.

Plaintiff is correct that the ALJ referred to Plaintiff's activities of daily living in her decision. However, Plaintiff is incorrect in her assertion that the ALJ put too much focus on her activities of daily living. As the Seventh Circuit indicated in *Jeske*, an ALJ is not forbidden from considering activities of daily living. The ALJ just cannot use that information and equate it to full-time work. Here, the ALJ did not equate Plaintiff's activities of daily living to full-time work. The ALJ simply referred to Plaintiff's activities of daily living to formulate her understanding of Plaintiff's condition, while considering other things such as subjective statements and objective opinions and findings. Therefore,

the ALJ did not err as Plaintiff suggests.

As another sub-issue to Plaintiff's concentration, persistence or pace argument, Plaintiff argues the ALJ erred by not acknowledging certain details of the state agency psychological consultants' opinions or the difference between those opinions and the RFC finding. Plaintiff argues that the ALJ "reached a very different conclusion than was detailed in the expert opinions" regarding Plaintiff's social restrictions. (Doc. 16, p. 14).

In light of the deferential standard of judicial review, the ALJ is required only to "minimally articulate" her reasons for accepting or rejecting evidence, a standard which the Seventh Circuit has characterized as "lax." *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008); *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008). The Seventh Circuit has "repeatedly held that although an ALJ does not need to discuss every piece of evidence in the record, the ALJ may not analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it." *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014). Moreover, the ALJ must "engage sufficiently" with the medical evidence. *Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016). However, the ALJ's discussion of the evidence must be sufficient to "provide a 'logical bridge' between the evidence and his conclusions." *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009) (internal citations omitted).

Dr. Tin and Dr. DiFonso both found Plaintiff moderately limited in the ability to work in coordination with or in proximity to others without being distracted by them and moderately limited in the ability to interact appropriately with the general public. In her decision, the ALJ explained very generally Dr. Tin's findings and Dr. DiFonso's affirmation of these findings, gave those opinions significant weight, and explained why

she gave those opinions significant weight by saying, "They were based on thorough reviews of the medical evidence and are consistent with the record as a whole." (Tr. 26). However, what the ALJ did not do is explain the discrepancy between those opinions and the RFC.

The ALJ limited Plaintiff to tolerating occasional interaction with coworkers and supervisors and no contact with the general public. The ALJ did this without explaining why Plaintiff was not more limited regarding interactions with coworkers, despite both state agency psychological consultants' opinions that Plaintiff is moderately limited in both interactions with coworkers and the public. There exists an unexplained discrepancy, and further articulation is necessary. As stated above, the ALJ must minimally articulate her reasonings for accepting or rejecting evidence and must engage sufficiently with the evidence, therefore, providing a logical bridge between the evidence and her conclusions. For the reasons stated above, the ALJ did not meet the aforementioned standards here.

This Memorandum and Order should not be construed as an indication that the Court believes Plaintiff was disabled during the relevant period or that she should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard and leaves those issues to be determined by the Commissioner after further proceedings.

<u>CONCLUSION</u>

The Commissioner's final decision denying Plaintiff's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C.

§405(g).

The Clerk of Court is directed to enter judgment in favor of Plaintiff.

**IT IS SO ORDERED.**

**DATED: October 15, 2020**

/s/  Mark A. Beatty
**MARK A. BEATTY**
**United States Magistrate Judge**